**MOBIL OIL CORPORATION, Appellant,**

v.

**Anna Mae ELLENDER, Individually and as Representative of the Estate of Eli Arnold Ellender, Deceased, et al, Appellees.**

No. 09–94–220 CV.

Court of Appeals of Texas, Beaumont.

Nov. 27, 1996.

As Amended Dec. 17, 1996.

Michael L. Baker, Strong, Pipkin, Nelson & Bissell, Beaumont, Eugene A. Cook, Bracewell & Patterson, Lori Meghan Gallagher, Andrew & Kurth, Houston, for appellant.

Paul F. Ferguson, Jr., J. Keith Hyde, Provost & Umphrey, Beaumont, Otto D. Hewitt, III, Hewitt Law Firm, Alvin Mark Hall, Nelson & Hall, Lubbock, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

### OPINION

WALKER, Chief Justice, delivered the opinion of the Court as to Part I, joined by BURGESS and STOVER, Justices, and as to Part III, joined by STOVER, Justice, and as to Part IV, the judgment of the court.

BURGESS, Justice, delivered the opinion of the Court as to Part II, joined by STOVER, Justice.

This appeal follows entry of a money judgment exceeding four million dollars based upon a unanimous jury verdict. Mobil Oil Corporation (Mobil) is appellant and Anna Mae Ellender, James G. Ellender, Dwain A. Ellender, Ricky Ellender, W. Craig Ellender, Arnold Kent Ellender, Jr. and Florence Faye Ellender Hoyt are appellees.

Trial ended on December 3, 1993, by return of the jury's verdict. Plaintiffs' Motion for Judgment was filed February 2, 1994, with hearing held on February 9, 1994. Final judgment was signed March 14, 1994, and file stamped March 23, 1994.

The trial of this case involved questions of Mobil's negligence and gross negligence in the death of Eli Arnold Ellender. On appeal, Mobil takes no issue with the jury's finding that Mobil's negligence proximately caused the death of Eli Arnold Ellender. Mobil does however, take issue regarding the amount of actual damages, contending entitlement to settlement credit. Thus, we affirm the trial court's judgment upholding the jury's finding that Mobil's negligence proximately caused Mr. Ellender's death.

In this case, the jury not only found Mobil negligent, but also determined such negligence amounted to gross negligence and further, that Mobil acted with "malice" toward the decedent, Mr. Ellender. The jury awarded appellees, plaintiffs below, $622,-888.97 as compensatory damages and $6,000,-000 as punitive or exemplary damages against Mobil. The trial judge, Michael Bradford, applied the punitive damage "cap" reducing punitive damages by approximately 2.5 million dollars.

### PART I

Mobil brings seventeen points of error to this Court. Initially, we address point of error ten which contends:

The trial court erred in rendering judgment against Mobil and in overruling its post-verdict motions because the evidence, verdict and judgment are improper because they do not conform to the standards articulated in *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994), or *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981), and, as a result, Mobil was denied substantive and procedural rights under Texas law.

Query: Does *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994) apply to this case?

### APPLICATION OF *MORIEL*

*Moriel* provides:

Inasmuch as we are remanding this for retrial, we consider it advisable, in the exercise of our common law duties, to articulate procedural standards for the trial court. The standards we announce apply to all punitive damage cases <u>tried in the future.</u>

*Moriel,* 879 S.W.2d at 26 (emphasis added) (effective date June 8, 1994).

■ The preceding directive seems clear enough—beginning June 8, 1994, *Moriel* requirements apply to "all punitive damage cases...." Our present case was tried during November and December of 1993; therefore, we should conclude *Moriel* simply does not apply to this present appeal. However, it is simply not so simple.

On June 22, 1994, just fourteen days following the *Moriel* decision, our Texas Supreme Court decided *Ellis County State Bank v. Keever*, 888 S.W.2d 790 (Tex.1994). Factually, Glenn Keever brought suit against Ellis County State Bank for malicious prosecution arising out of the arrest and indictment of Keever for hindering secured creditor Bank from retrieving collateral. Based on the jury verdict, the trial court rendered judgment for Keever, awarding actual and punitive damages. The Dallas Court of Appeals reversed the judgment as to prejudgment interest on the punitive damages, but otherwise affirmed *Ellis County State Bank v. Keever*, 870 S.W.2d 63 (Tex.App.—Dallas 1992). Clearly, Keever was tried prior to *Moriel*.

Our Supreme Court granted writ, remanding, in part, with instruction "to reconsider the punitive damage award in accordance with the standards articulated in *Moriel.*" *Keever*, 888 S.W.2d at 799. Repetitive, but poignant, "[t]he standards we announce apply to all punitive damage cases <u>tried in the future.</u>" *Moriel*, 879 S.W.2d at 26 (emphasis added).

*Keever's* subsequent history, following remand to the Dallas Court, is worthy to tell. Upon remand, the Dallas Court seemingly followed Supreme Court direction by detailing relevant evidence supportive of the jury's findings and the trial court's judgment. *Ellis County State Bank v. Keever*, 913 S.W.2d 605, 611 (Tex.App.—Dallas 1995). Although the Dallas Court in its "Application of Law to Facts" keenly addressed each requirement of *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981) (often referred to as the "*Kraus* factors"), on November 16, 1995, the Texas Supreme Court again reversed and remanded *Keever* to the Dallas Court "for further proceeding." The Court determined that the detailing of evidence pursuant to

*Kraus* must be accompanied by an explanation of "why" such evidence either supports or does not support the punitive damage award. *Ellis County State Bank v. Keever*, 915 S.W.2d 478, 479 (Tex.1995). We reserve a discussion of the "why" requisite for later in this opinion.

Though the clear dictate of *Moriel* is post-active, *Keever* speaks contrarily:

Although *Moriel* was decided after the court of appeals' decision in this case, its holding should be applied to a pending case in which a party has preserved the complaint that the court of appeals failed to properly scrutinize a punitive damage award. Here, the Bank specifically argues in its application for writ of error that the court of appeals failed to adequately consider the *Kraus* factors. Also in its motion for rehearing *en banc* in the court of appeals, the Bank presented a point of error complaining that 'the court of appeals erred in failing to order remittitur of punitive damages awarded against the Bank,' arguing under this point that the punitive damage award was 'patently unreasonable' and 'so excessive as to indicate passion or prejudice on the part of the jury.' Although the Bank did not specifically refer to the *Kraus* factors in the motion for rehearing, it adequately preserved this issue below under our practice of 'constru[ing] liberally points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants.' *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

*Keever*, 888 S.W.2d at 799.

In view of what we perceive to be somewhat of a quagmire, only judicial obstinance would compel us to pursue this opinion as if *Moriel* did not apply. We cannot ignore, however, what appears to be an impediment, an encroachment, an infringement or lessening of appellees' right to a just, fair and equitable adjudication of their rights as litigants. Appellees tried their lawsuit without knowledge or beneficial guidance from *Moriel*. Likewise, the trial judge pursued this trial according to the law existing at trial time. Now, only Mobil can receive the benefits of *Moriel* scrutiny. Mobil requests this

Court to render judgment that appellees take nothing against Mobil and alternatively to remand this case for a new trial. We readily admit the "safe" address to this case is to seek reason for remand to provide appellees the justness of a trial under now existing law. We choose to ignore the easy way out and leap headlong into this appeal. Further, we intend to recognize *Keever* and apply *Moriel* post-actively.

Since *Moriel* requires a detailed analysis of the evidence, microscopically viewed through application of the *Kraus* factors, we set forth the evidence, first by parties overview, then through more precise detailing. In so doing, we sustain appellant's point of error ten only as to requiring *Moriel/Kraus* analysis. We find no error in the trial court's conformity to required standards. Thus we overrule the substantive elements of appellant's point of error ten.

## APPELLEES' OVERVIEW OF THE EVIDENCE

The decedent, Mr. Eli Ellender, was a millwright working out of Union Local 2484. Mr. Ellender worked for contractors at Mobil's Beaumont Plant during the mid-sixties and early seventies. While intermittently on Mobil's premises, Mr. Ellender worked on pumps, product lines, and steam cleaning equipment. During his work periods at Mobil, Mr. Ellender was in daily contact with benzene. Long-time co-workers of Mr. Ellender testified they and decedent daily washed and cleaned their tools and hands in benzene, sometimes more than once a day. This daily activity exposed Mr. Ellender to benzene at concentrations of up to 1,000 p.p.m. in air.[1] The benzene to which Mr. Ellender was exposed was provided by Mobil, with Mobil's knowledge. Others, including former Mobil employees, testified workers used benzene to clean and wash clothes, tools and hands.

## APPELLANT'S OVERVIEW OF THE EVIDENCE

Over the course of more than twenty-seven years, the decedent was employed by various construction companies and worked as a millwright or machinist who repaired and serviced equipment. Those construction companies and their workers in turn were hired by independent contractors by various owners and operators of refineries and plants. Between 1963 and 1977, the decedent worked periodically as an independent contractor millwright at Mobil's chemical plant and refinery, as well as at other facilities owned and operated by companies unrelated to Mobil. The decedent was never employed by Mobil and did not work continuously at Mobil facilities. Like other millwrights, decedent was called in only on an as-needed basis to repair or service equipment.

Mobil manufactures a wide range of chemicals, as do many other companies with facilities in the Beaumont area. In Beaumont, Mobil currently has a refinery and a chemical plant. Mobil's Beaumont refinery has never manufactured benzene. In the mid–1960's to mid 1970's, Mobil Chemical had two chemical plants in Beaumont. One plant, which Mobil Chemical still owns and operates, is an olefins and aromatics plant (O & A plant). The O & A plant has two units: (i) an olefins unit that manufactures ethylene, propylene, butylene and other products, and (ii) an aromatics unit that manufactures benzene. The other plant, which Mobil no longer owns, manufactured a white powder known as terephthalic acid or TPA (TPA plant). Terephthalic acid does not contain benzene; it is produced by the oxidation of paraxylene. The decedent worked primarily at the TPA plant and only a short time at the O & A plant. Mobil contends there is no evidence TPA causes leukemia.

## EXCLUSION OF EVIDENCE

In this appeal, Mobil makes no challenge to Jury Question 1 which provides:

Did the negligence, if any, of Mobil proximately cause the death of Eli Arnold Ellender?

Answer: "Yes" or "No."

---

1. Today's permissible exposure level, by OSHA (Occupational Safety and Health Association) regulation, is 1 p.p.m. over an eight hour period and 5 p.p.m. for short-term exposure of 15 minutes.

Answer: <u>Yes</u>

■ We view Mobil's decision not to challenge the jury's negligence finding as acknowledging that Mr. Ellender died of and from acute myelogenous leukemia (AML), proximately caused by Mobil's negligence. In light of Mobil's decision not to challenge the jury's negligence findings, we overrule appellant's point of error seventeen contending the trial court erred in excluding Mr. Ellender's sworn deposition testimony from his prior asbestos products liability suit in which Mr. Ellender admitted he had never been exposed to any chemicals, such admission bearing directly on Mobil's defense. We conclude any error committed by the trial court's exclusion of this evidence is now moot for Mobil's failure to challenge the factual finding that it was Mobil's negligence in exposing Mr. Ellender to benzene which brought about his death. Point of error seventeen is overruled.

## ERROR AS ALLEGED BY MOBIL

Mobil brings the following points of error relating to the jury's affirmative findings of gross negligence, malice and exemplary damages:

### Point of Error One

The trial court erred in rendering judgment against Mobil and in overruling its Rule 301 motion because there is no evidence or legally insufficient evidence of gross negligence.

### Point of Error Two

The trial court erred in rendering judgment against Mobil and in overruling its motion for new trial because there is factually insufficient evidence of gross negligence or the jury's gross negligence finding is against the great weight and preponderance of the evidence.

### Point of Error Three

The trial court erred in rendering judgment against Mobil and in overruling its Rule 301 motion because there is no evidence or legally insufficient evidence of malice.

### Point of Error Four

The trial court erred in rendering judgment against Mobil and in overruling its motion for new trial because there is factually insufficient evidence of malice or the jury's malice finding is against the great weight and preponderance of the evidence.

### Point of Error Five

The trial court erred in rendering judgment against Mobil and in overruling its post-verdict motions because there is no evidence or legally insufficient evidence to support the exemplary damages.

### Point of Error Six

The trial court erred in rendering judgment against Mobil and in overruling its post-verdict motions because there is factually insufficient evidence to support the exemplary damages or the exemplary damages are against the great weight and preponderance of the evidence.

### Point of Error Seven

The trial court erred in rendering judgment against Mobil on the exemplary damage award and in overruling its post-verdict motions because there is no evidence or legally insufficient evidence that any Mobil vice principal committed any act of gross negligence or malice, which is a legal prerequisite to exemplary damage liability.

### Point of Error Eight

The trial court erred in rendering judgment against Mobil on the exemplary damage award and in overruling its post-verdict motions because there is factually insufficient evidence that any Mobil vice principal committed any act of gross negligence or malice, which is a legal prerequisite to exemplary damage liability.

### Point of Error Nine

The trial court erred in rendering judgment against Mobil and in overruling its post-verdict motions because the exemplary damages are excessive.

## Point of Error Eleven

The trial court erred in rendering judgment against Mobil, in overruling Mobil's objections to the jury charge and in overruling its post-verdict motions because Question 12 was defective and cannot support the award of exemplary damages.

## Point of Error Twelve

The trial court erred in rendering judgment against Mobil, in overruling its objections to the jury charge and in overruling its post-verdict motions because the Texas system for awarding and reviewing exemplary damages in general and as applied in this case violates Mobil's constitutional rights under the Fourteenth Amendment to the Constitution of the United States and the due course of law provisions in article I, sections 13 and 19, of the Constitution of the State of Texas.

## JURY'S FINDINGS

Jury Questions 10 and 11, being conditioned upon the negligence finding in Jury Question 1, provided:

### Question 10

Was such negligence of Mobil "gross negligence"?

"Gross negligence" means more than momentary thoughtlessness, inadvertence or error of judgment so as to constitute an entire want of care as to establish that the acts or omissions of Mobil were the result of actual conscious indifference to the rights, safety or welfare of the persons effected?

Answer "Yes" or "No."

Answer: Yes

### Question 11

Did Mobil act with "malice" towards Eli Arnold Ellender?

"Malice" means an act that is carried out by Mobil with a flagrant disregard for the rights of others and with actual awareness on the part of Mobil that their acts will, in reasonable probability, result in either human death or great bodily harm?

Answer "Yes" or "No."

Answer: Yes

### Question 12

What sum of money, if any, should be assessed against Mobil as exemplary damages for the death of Eli Arnold Ellender?

"Exemplary damages" means an amount that you may, in your discretion, award as an example to others and as a penalty or by way of punishment, in addition to any amount that you may have found as actual damages.

Answer in dollars and cents:

$ 6 million

Mobil contends the foremost error committed by the trial court was its refusal to apply *Moriel* scrutiny, post-trial, to gross negligence, malice and exemplary damage findings. Appellees vigorously argue *Moriel* does not and should not apply to this appeal. Appellees further contend that, assuming arguendo *Moriel* does apply, the *Moriel* standards have been met or exceeded in the present case.

■ Since this Court is determined to analyze this appeal pursuant to *Moriel* requirements, we must make clear the standard for reviewing the evidence. According to *Moriel*, to reach punitive damages, the record must contain legally sufficient evidence of Mobil's gross negligence. Otherwise, we must reverse the judgment of the trial court. *Moriel*, 879 S.W.2d at 24. However, if the evidence of gross negligence is legally sufficient, we may not reverse the trial court's judgment. *Id.*

*Moriel*, 879 S.W.2d at 25, instructs:

In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 522, 523 (1991) ('[T]he court must be persuaded that reasonable minds could not differ on the matter.... Ultimately, the test for "conclusive evidence" ... is similar to the test for "no evidence" ... the court

asks whether reasonable minds could differ about the fact determination to be made by the jury.'); [*Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L.REV. 361, 363–65 (1960) ] ('The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence.'); *see also Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984); *Woods v. Townsend*, 144 Tex. 594, 192 S.W.2d 884 (1946); *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059 (1898); *McDonough v. Zamora*, 338 S.W.2d 507, 515–16 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.).

■ Thus, as to gross negligence, we are not concerned with Mobil's factual insufficiency or great weight and preponderance of the evidence points. Our sole concern is whether there is some evidence of gross negligence on the part of Mobil which overcomes Mobil's legal insufficiency/no evidence contention. *See Universal Serv. Co., Inc. v. Ung*, 904 S.W.2d 638, 642 (Tex.1995). Factual insufficiency or great weight and preponderance review in gross negligence cases applies where the <u>amount</u> of punitive damages awarded has been preserved. *See Moriel*, 879 S.W.2d at 30–31. It is as to the <u>amount</u> of punitive damages the *Kraus* factors become significant. *Kraus*, 616 S.W.2d at 908.

■ We cannot simply review questions of gross negligence by traditional standards requiring appellate courts to look only at the evidence favoring the verdict. *Apache Corp. v. Moore*, 891 S.W.2d 671, 680 (Tex.App.—Amarillo 1994).[2] *Moriel* requires that before a gross negligence finding can be sustained, the evidence must show <u>both</u> that the act was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm. *Moriel*, 879 S.W.2d at 22–23.

Therefore, we are obligated to review all factors attributable to the exemplary damage award, setting forth in detail those facts supporting the award, and then determine whether there is legally sufficient evidence to support the objective and subjective components and the finding. *Apache Corp.*, 891 S.W.2d at 681.

■ It is Mobil's burden on appeal to establish there is no evidence to support the jury's finding of gross negligence. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920–21 (Tex.1981). The finding of gross negligence will be upheld if there is legally sufficient evidence (1) the defendant's conduct created an extreme risk of harm and (2) the defendant was aware of the extreme risk. *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex.1993). "In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level which would enable reasonable and fair-minded people to differ in their conclusion." *Apache Corp.*, 891 S.W.2d at 681 (citing *McDonough v. Zamora*, 338 S.W.2d 507, 515–16 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.)).

■ *Moriel* provides a "functional interpretation" of gross negligence requiring both an objective and subjective analysis. "Objectively, the conduct of defendant must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence." *Moriel*, 879 S.W.2d at 22. "Subjectively, the defendant must have *actual awareness* of the extreme risk created by his or her conduct." *Id.* In reviewing the objective component of gross negligence, "extreme risk" must amount to more than a remote possibility of injury or a high probability of minor harm. *Id.* "Extreme risk" is satisfied by showing "likelihood of serious injury." *Id.* Further, in reviewing evidence of gross negligence, we

---

2. The Texas Supreme Court denied writ. On appeal to the Untied States Supreme Court, that Court vacated the judgment of the Amarillo Court of Appeals and remanded the case for further consideration in light of *BMW of North America, Inc. v. Gore*, 517 U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

In *BMW*, the Supreme Court held the $2 million punitive damages award was grossly excessive and therefore violative of due process. The Court found "none of the aggravating factors associated with particularly reprehensible conduct [were]" present. *Id.* —— U.S. at ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 827.

We note that in this case, as in *Apache Corp.*, such aggravating factors are clearly present and are thoroughly detailed under a *Kraus* analysis.

examine the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. *Id.* at 23.

Succinctly stated, to uphold the gross negligence finding, *Moriel* requires legally sufficient evidence showing that the presence, use and control of benzene at Mobil's facility, during the pertinent time periods between 1963 and 1977, created an extreme risk to Mr. Ellender, that such risk exceeded remote possibility, creating "a likelihood" of serious injury, *Wal–Mart Stores, Inc.*, 868 S.W.2d at 327, and conjunctively, that Mobil had actual awareness of the extreme risk created by its conduct, extreme risk being a function of both the magnitude and the probability of the anticipated injury. *Moriel,* 879 S.W.2d at 22. The evidence must be legally sufficient to support both standards, *i.e.,* the objective and the subjective. Proof of Mobil's "subjective" state of mind does not require "direct evidence" for such may be proven by either direct or circumstantial evidence. *Id.* at 23.

## OBJECTIVE EVIDENCE OF MOBIL'S GROSS NEGLIGENCE

■ Query: Did Mobil's conduct involve an extreme degree of risk creating a likelihood of serious injury to Mr. Ellender?

During the times Mr. Ellender worked at Mobil's premises, he was exposed to benzene when required to open pumps containing benzene for the purpose of changing seals and gaskets. Mr. Ellender was also exposed to benzene from Mobil's ditches and sewers. There is also evidence Mr. Ellender was exposed to benzene through fugitive emissions such as leaks from stacks, valves and pumps.

In 1989, Dr. Sheppard, called in as a medical consultant by Mr. Ellender's treating physician, diagnosed acute myeloblastic leukemia (AML) which was confirmed by the attending pathologist. Dr. Sheppard is Board-certified in Internal Medicine and was twice Chief of Staff for Park Place Hospital. Dr. Sheppard testified Mr. Ellender's AML was caused by occupational exposure to benzene. Dr. Gardner, Board-certified in Internal Medicine, former Chief of Staff and current Clinical Professor of Hematology/Oncology at UTMB/Galveston, testified Mr. Ellender died of AML due to benzene exposure. Dr. Dement, of Duke University, agreed with the AML diagnosis and that Mr. Ellender's occupational benzene exposure was the cause of his disease. Dr. Dement's credentials include associate professor of occupational and environmental medicine at Duke University, certified industrial hygienist, former industrial hygiene engineer with NIOSH (the federal agency responsible for occupational health research), former Chairman of ACGIH (agency establishing threshold limit values), and director of the National Institute of Environmental Health Sciences' Office of Disease Prevention and Exposure Research. Dr. Bingham, University of Cincinnati professor of environmental health, former head of OSHA (Occupational Safety and Health Association), and toxicologist, testified Mr. Ellender's occupational benzene exposure caused his AML.

A benzene data sheet published by the National Safety Council in 1950 states in pertinent part "[b]ecause the appearance and pleasant smell of benzene give no warning of its toxic effect and because a victim may become incurably poisoned before he feels ill, benzene is one of the most insidious poisons ever to find wide industrial use." NATIONAL SAFETY COUNCIL, BENZENE (1950). Mobil stipulated its National Safety Council membership since 1922.

Benzene's destructive effect on human blood and blood-forming organs was known in the early 1900's. In 1926, the National Safety Council reported "[t]he most characteristic pathological effect of [benzene] is perhaps its destructive influence upon the cells of the blood and the blood-forming organs." WINSLOW, C.E.A. ET AL, FINAL REPORT OF THE COMMITTEE ON BENZOL 27 (1926). In 1948, the American Petroleum Institute (API) informed its members that "[i]nasmuch as the body develops no tolerance to benzene, and as there is a wide variation in individual susceptibility, it is generally considered that the only absolutely safe concentration for benzene is zero." AMERICAN PETROLEUM INSTITUTE, API TOXOLOGICAL REVIEW—BENZENE

4 (1948). Mobil stipulated its API membership since 1919. Other petroleum chemical companies knew of benzene's harmful effect. In 1943, a Dr. Soley reported to Shell Development Company that "prolonged exposure to low concentrations [of benzene] may be most dangerous". SOLEY, M.H., REPORT TO SHELL DEVELOPMENT COMPANY ON BENZENES, NITROBENZENES, ANILINES AND XYLIDINES 2 (1943). In 1948, Exxon's industrial hygienist noted the definite correlation between cancer and benzene. Exxon was informed in 1953, 10 years prior to Mr. Ellender's first exposure to benzene at Mobil, that "no concentration of benzene is considered to be safe...." Exxon was informed a warning should be placed on benzene containers using the word "poison". Conoco also knew of the hazards of benzene in the 1950's. In language virtually identical to the 1948 API study, Conoco's 1953 safety manual stated "as there is a wide variation in individual susceptibility it is generally considered the only absolutely safe concentration for benzene is zero." CONOCO, CONOCO SAFETY MANUAL 145 (1953).

Dr. Potts, Mobil's regional medical director for the western region, inclusive of Beaumont, from 1960 to 1983, knew while in medical school in the 1940's benzene caused blood disease. Dr. Potts knew in the 1950's washing hands and tools in benzene was hazardous to workers. Dr. Potts testified he had access to the API and National Safety Council reports in the 1950's and probably saw the 1948 API study. Dr. Potts testified he felt Mobil knew the hazards of benzene in the 1950's. Dr. Potts further testified as to discussing benzene hazards with Mobil's Beaumont plant physician, Dr. Stewart, in the 1950's. Dr. Esslinger, Mobil's Beaumont plant doctor throughout the 1960's, knew, as of 1960, benzene should be avoided, it was toxic and harmful to the body. Mobil's director of epidemiology and medical information services, reported in 1983 "[e]vidence that exposure to high doses of benzene is related to [AML] is strong and was first reported about 70 years ago."

The evidentiary record clearly shows Mobil knew the dangers of benzene by the late 1940's and 1950's, 10 years prior to Mr. Ellender's appearance on Mobil's premises.

Co-workers with Mr. Ellender testified Mobil never provided any warnings during the 1960's or 1970's that benzene was harmful or that it caused cancer or leukemia. Further, Mobil had no safety program for contractors. Mobil's own witnesses agreed Mobil management declined to tell them of the dangers of benzene in the 1960's and early 1970's. Interestingly, Mr. Cunningham, a safety officer at Mobil's plant, did not know benzene could cause leukemia or other ramifications of benzene until Mobil's attorney informed him of such prior to his 1993 deposition in this case. Mr. Dunham, a Mobil industrial hygienist, testified he saw no warning signs at Mobil's Beaumont plant prior to or during 1978. Dr. Esslinger, former medical director for Mobil Chemical in Beaumont, testified he knew workers used benzene to wash their hands and a worker washing his hands or tools in benzene, indicated the worker was not properly warned of benzene hazards. Former Mobil industrial hygienist, Mr. Witzke, testified it was common for workers at Mobil to wash clothes in benzene and he personally saw this being done at least once while at Mobil's Beaumont plant during 1973–1976. Mobil did not provide contractors such as Mr. Ellender with protective equipment. During the 1950's and 1960's, Mobil did not tell its own employees to wear respirators to protect themselves from benzene exposure. Dr. Dement testified Mobil's industrial hygiene program was poor and practically nonexistent for contractors. Mobil did no benzene monitoring at all prior to 1973 and, in fact, Mobil's unwritten policy was not to conduct benzene monitoring for workers like Mr. Ellender. Mr. Dunham admitted personal monitoring is the only sure way to assess worker exposure to benzene. According to Dr. Dement, technology for the air sampling of benzene has existed since the 1920's and by 1950 a variety of techniques and devices were available. Mobil never monitored Mr. Ellender or his co-workers. Mobil did no medical surveillance monitoring of contract employees.

In 1988, Mobil had not yet labeled all benzene containing process lines as required by OSHA. Dr. Potts testified Mobil believed it had no obligation to inform workers of injury causing materials unless Mobil was

"very sure" it would affect the workers. Up to 1988, Mobil was not notifying workers of benzene exposure levels above action levels and permissible exposure levels. Dr. Dement testified a worker's right to know about his exposure to benzene is a matter of safety and necessary for worker protection and that the failure to inform workers of benzene exposure reflected Mobil's unconscionable disregard for worker safety. Mobil's current and former employees, called by Mobil to testify at trial, agreed workers had a right to know.

Appellees contended Mobil's failure to warn and inform workers of benzene hazards, failure to provide protective equipment and failure to monitor and test workers for exposure to Mobil benzene while on Mobil premises amounted to gross negligence in light of Mobil's knowledge long before Mr. Ellender's exposure. Dr. Bingham testified Mobil exhibited conscious disregard toward Mr. Ellender. Dr. Dement testified Mobil demonstrated disregard for worker safety, its policy not to monitor contractors like Mr. Ellender reflected its conscious disregard for worker safety and welfare, and Mobil's corporate management policies on industrial hygiene were grossly inadequate. Appellees contend not only did Mobil deliberately disregard worker safety, but it used worker health and safety as a bargaining chip in its negotiations with OSHA.

Mobil counters the foregoing evidence by pointing out the decedent's entire work history at Mobil's facilities does not reflect a single complaint about exposure—to benzene or any other chemicals. Mobil contends when Mr. Ellender was deposed in another case against certain asbestos manufacturers for asbestosis, decedent unequivocally denied under oath he had ever been exposed to chemicals. The trial court excluded this evidence and, as noted above, the propriety of that ruling is now moot.[3] Mobil contends when Mr. Ellender sought medical treatment shortly before his death, he never mentioned exposure to benzene. The medical records disclose no reference to benzene. Mobil posits that only after Mr. Ellender died did some members of his family or anyone else claim his AML was due to purported benzene exposure.

Mr. Ellender's primary treating physician did not testify at trial. However, Dr. Shepherd, a physician who consulted with the treating physician, testified he was asked to assist in the diagnosis because Mr. Ellender complained of a nonspecific illness, muscle aches and pains, weakness and some fever. After receiving test results, Dr. Shepherd made a written diagnosis of "acute leukemic crisis," noted "crepitation of both lung fields" and wondered about possible congestive heart failure and pulmonary edema. Within three days of seeking treatment, Mr. Ellender died of "cardiac arrest brought on by the cessation of cardiac and respiratory function." Mobil points out Dr. Sheppard did not know Mr. Ellender had pulmonary asbestosis and did not review Mr. Ellender's medical records from the Texas Lung Institute, even though prior to the decedent's diagnosis of leukemia he had been diagnosed with tuberculosis and pulmonary asbestosis. Mobil also highlights Mr. and Mrs. Ellender recovered at least $142,000 when they settled their prior asbestos products suit.

Mobil points out that in 1963, when Mr. Ellender first worked at Mobil, the only industrywide standards were guidelines proposed by the American Conference of Governmental Industrial Hygienists (ACGIH), a group of occupational health professionals. ACGIH recommended "threshold limit values" for certain substances, proposing a threshold limit value for benzene in 1963 of 25 parts per million (ppm). In 1974, the ACGIH adopted a threshold limit value of 10 parts per million. Congress first developed industry-wide standards after 1970, Mobil emphasizes, when it created OSHA and passed the Occupational Safety and Health Act. The first OSHA standard for benzene was issued in 1971 and incorporated the ACGIH threshold limit values, calling them "permissible exposure limits." Compliance with these OSHA standards involved evaluat-

---

**3.** Appellees' point of error seventeen challenging the trial court's exclusion of that evidence has been overruled.

ing potential exposure. Mobil proffers that from 1974–1977, it conducted air testing and medical testing at the refinery and O & A plant, which found no abnormalities suggesting benzene exposure. It is Mobil's specific contention that "[s]tatistically, Mobil's Epidemiology studies confirm that under *Moriel's* substantive test for gross negligence, Mobil was reasonable in believing that its operations created no 'extreme risk' of 'serious harm' to the decedent." Mobil claims these studies show that for Mobil refinery workers who worked in the 1960's and 1970's, when the decedent worked on Mobil premises, there was no increased risk of dying from leukemia. Further, Mobil points out, no Mobil worker contacted had contracted leukemia from 1962, when the plant opened, through 1981.

Although Mobil highlights its air testing and medical testing procedures, we find no evidence in the record where Mobil shared its concern regarding the effects of benzene with any contractors or employees of contractors other than its own. Again, Mobil tendered no evidence that it ever informed workers like Mr. Ellender of the need for industrial hygiene monitoring or medical testing of employees exposed to benzene.

■ Does the evidence in this case propel beyond ordinary negligence? "An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent. Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent." *Moriel,* 879 S.W.2d at 22. We conclude the evidence is legally sufficient to show Mobil's conduct regarding the presence and use of benzene at its Beaumont facilities created an extreme degree of risk to contract workers such as Mr. Ellender, which in turn created a likelihood workers such as Mr. Ellender would suffer serious injury.

## SUBJECTIVE EVIDENCE OF MOBIL'S GROSS NEGLIGENCE

Query: Did Mobil have actual, subjective awareness of the risk involved to Mr. Ellender, but nevertheless proceeded with conscious indifference to the rights, welfare and safety of Mr. Ellender?

Mr. Ellender, along with other co-workers, was exposed to benzene in many ways with high potential for heavy benzene exposure. There is evidence Mr. Ellender and other co-workers performed their labor under Mobil's direction. Mobil told contract workers like Mr. Ellender where to work and had complete authority to stop work or shut down if anything appeared unsafe. Mobil's practices and procedures leading to Mr. Ellender's benzene exposure were long-standing and widely known. Mobil allowed and encouraged workers to use benzene to wash their hands, tools and clothes. Mobil allowed workers to be exposed to benzene contained in piping and equipment. Mr. Witzke, Mobil's industrial hygienist admitted that during his 1973–1976 tenure at Mobil "it was a normal occurrence that ... benzene was leaked to the ground or spilled to the ground on the disconnection and connection operations. So there was always benzene being spilt onto the ground." Mr. Ellender and workers similarly situated were exposed to benzene from Mobil ditches and sewers. Workers were also exposed to benzene through fugitive emissions into the air.

■ *Moriel's* subjective component may be proven by direct or circumstantial evidence. *Moriel,* 879 S.W.2d at 23. *Accord Apache Corp.,* 891 S.W.2d at 682. Clearly, monitoring and sampling are the best ways to determine a worker's benzene exposure, allowing protective, preventive steps to be taken to avoid further exposure. However, the evidence reveals it was Mobil's unwritten policy not to monitor contract workers like Mr. Ellender. When Mobil's industrial hygienists attempted to monitor contract workers like Mr. Ellender, Mobil insisted such procedure be stopped.

Mobil did not tell contract workers about the hazards of benzene exposure until the mid-to-late 1980's, after Mr. Ellender ceased to work at Mobil. Mobil neither required nor provided workers such as Mr. Ellender with protective gear to prevent benzene exposure. Mobil posted no signs warning of the presence of benzene or of the hazards of benzene exposure during Mr. Ellender's tenure at Mobil. Mobil's sampling for benzene

exposure at its Beaumont plant was non-existent prior to 1972 or 1973 and was almost non-existent prior to 1976 although the technology and methodology had existed since the 1920's. Mobil failed to institute a benzene leak detection/prevention program until 1985, although the technology had been available for decades. Dr. Esslinger testified Mobil had an obligation to tell workers about their exposure to benzene. There is evidence Mobil was providing itself with inadequate data to assess contract workers' benzene exposure at the plant even into the late 1980's. Mobil's air monitoring for benzene exposure at the plant neither accurately nor adequately represented contract worker exposure to benzene even by the late 1980's. As late as 1988–89, Mobil continued its policy of not notifying workers in the plant about benzene exposure levels. Mobil did not distribute benzene exposure warnings and information to workers at the plant nor did Mobil pass on to contract workers literature from API or the Chemical Manufactures Association warning of the dangers of benzene exposure. Mobil, though aware of the dangers associated with benzene, did not provide warning signs to workers until approximately 1987. Though Mobil knew the hazards associated with worker exposure to benzene, it failed to inform workers of these hazards and failed to control their exposure. According to Dr. Dement, there was no rational reason not to tell workers about their benzene exposure. Mobil excluded any reference to benzene hazards in its 1967 "Mobil Safety and Security Regulations for Contract Workers."

In 1926, the National Safety Council recommended protective measures to guard against benzene exposure, e.g., that enclosed apparatus be used for handling benzene, proper ventilation, use of respirators to prevent inhalation, use of gloves to prevent absorption through the skin, systematic medical examinations, and worker education. These precautions were available to Mobil in 1926, when the report was published. Samples taken at Mobil in the 1960's and 1970's reflected excessive exposure to benzene. By brief, Mobil points out "[t]he decedent was not diagnosed with leukemia until 1989, 26 years after he first worked part-time on Mobil's premises and 12 years after he last worked on Mobil's premises." Again, Mobil has not challenged the facts, the finding, nor the law as to its negligence being the proximate cause of Mr. Ellender's death resulting from exposure to benzene on Mobil's premises.

Clearly, there is direct and circumstantial evidence, with reasonable inferences therefrom, that Mobil had actual, subjective awareness of the risk of benzene exposure to Mr. Ellender, but proceeded with conscious indifference as to his rights, safety and welfare.

We find the case of *Apache Corp.*, 891 S.W.2d at 671, beneficially comparative. In *Apache Corp.*, plaintiffs claimed negligence and gross negligence stemming from allegations Apache company men working on the Key 1–11 well took kickbacks in the form of money, cocaine, alcohol, prostitutes, and the like in exchange for giving work to various companies. It was alleged Apache was aware of these ongoings prior to the blowout of that well. Our Amarillo Court affirmed the punitive damages awarded and our Texas Supreme Court denied writ.

In that case, Apache knew about its workers taking "kickbacks" which admittedly affected job performance; however Apache did not stop such practices. In our present case, Mobil knew of the dangers associated with benzene exposure but did not prevent such exposure, protect Mr. Ellender from those dangers, or warn him of them.

In *Apache Corp.*, the defendant did not conduct required testing prior to continuing its operation. Though evidence reveals Mobil did certain testing, we find no evidence Mobil shared such information with workers like Mr. Ellender.

In *Apache Corp.*, the defendant knew there were "leaks" on the equipment but determined to continue operations anyway. Mobil knew workers were being exposed to benzene through various and sundry means, not the least of which was the use of benzene to wash hands, clothes and tools, and did not prevent or limit such exposure.

In *Apache Corp.*, the defendant knew "the relief valve needed a steady flow of nitrogen

to operate properly and prevent the blowout; yet Apache did not adequately monitor the flow...." *Id.* at 682. Mobil failed to adequately sample and monitor exposure and apprise workers of the dangers associated with benzene.

We believe the facts of our present case to be more compelling, supportive of gross negligence than are the facts in *Apache Corp.* Mobil's policy was to not monitor contract workers like Mr. Ellender for benzene exposure and further, Mobil prohibited its industrial hygienists from doing so.

We conclude there is legally sufficient evidence to support the subjective prong now required in upholding the gross negligence finding. Appellant's points of error one and two are overruled.

### MALICE FINDING

Mobil contends the jury's malice finding should be set aside because there is no evidence of malice. For authority, appellant cites *Ware v. Paxton,* 359 S.W.2d 897, 898, 902 (Tex.1962), and *Kroger Food Co. v. Singletary,* 438 S.W.2d 621, 625–627 (Tex.Civ. App.—Beaumont 1969, no writ). Appellant makes no meaningful application of these cases. Mobil contends it had a "reasonable basis for its conduct and its belief that its operations created no extreme risk of serious harm to the decedent or the other workers." Though it is unclear in appellant's brief, it appears Mobil is contending its conduct should be evaluated in a manner similar to appellate evaluation in bad faith insurance cases. If Mobil is suggesting "reasonable basis" should be applicable in non-insurance gross negligence cases, we hereby reject such a proposal.

■ Other than these generalities, Mobil makes no articulable argument regarding its position. Appellees only respond generally to Mobil's no evidence/insufficiency of the evidence points regarding malice. Nor do appellees challenge the trial court's "capping" of punitive damages pursuant to TEX. CIV. PRAC. & REM.CODE § 41.007,[4] which is not

required where malice is found. Though appellees bring no cross-point as to the trial court's failure to disregard "capping" under § 41.007, in view of the evidentiary record we simply cannot sustain appellant's points of error three and four, for the record indeed supports the malice finding. We do however, observe for, but do not so hold, that a finding of malice supported by legally sufficient evidence should obviate any requirement for application of *Kraus* factors in punitive damage cases.

### MOBIL'S VICE PRINCIPAL POINTS

Mobil's points of error seven and eight contend the evidence neither legally nor factually supports any finding that any Mobil vice principal committed any act of gross negligence or malice. Appellant uses as its primary authority *Hays v. Houston G.N.R.R.,* 46 Tex. 272 (1876) and *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397 (1934), *overruled in part by Wright v. Gifford–Hill & Co., Inc.,* 725 S.W.2d 712 (Tex.1987).

■ We reject Mobil's argument and overrule points of error seven and eight. The record is clear Mobil neither argued nor contended for its vice principal position at the time of trial. Mobil first raised the vice principal question in its post-verdict motions. This Court has previously held: "[w]hen some, but not all, of a cluster of issues necessary to sustain a ground of recovery are given and answered by the jury without objection or request, the trial court may make written findings on [the] omitted issues.... If no written findings are made, the omitted issues are deemed to have been found by the court in such a manner to support the judgment". *Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263, 266 (Tex.App.—Beaumont 1987, no writ); *Phelan v. Lopez,* 701 S.W.2d 327, 331 (Tex.App.—Beaumont 1985, no writ); *Ramos v. Frito–Lay, Inc.,* 784 S.W.2d 667, 668–9 (Tex.1990).

4. Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 46, *amended by* Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 111.

For current version *see* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008 (Vernon 1986 & Supp.1996).

■ We conclude Mobil's failure to challenge the "deemed findings" by points of error or argument amounts to a waiver of Mobil's position in this appeal. A "deemed finding" must be challenged in the same manner as express findings by the trial court or the jury, or the same is waived. *See Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex. 1980). Points of error seven and eight are overruled.

## EXEMPLARY DAMAGES

Mobil points of error five, six, nine, eleven and twelve question the exemplary damage award.

■ Mobil points out, to our agreement, that courts of appeals share the duty with trial courts to prevent erroneous and excessive exemplary damage awards. We recognize this to be a clear import of *Moriel.* In order to procedurally safeguard against the potential of excessive awards, our Texas Supreme Court established criteria to control those potentials. In *Kraus,* 616 S.W.2d at 910, our highest civil court set forth guiding factors to determine the reasonableness of an award of exemplary damages. Questions relating to excessiveness are to be considered at all levels—trial, post-trial review by trial court, and through the appellate process. At all levels, consideration must be given to: "(1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety." *Kraus,* 616 S.W.2d at 910; *see also Moriel,* 879 S.W.2d at 16–17, 28, 29 and n. 26.

It is Mobil's contention the trial court failed, thus erred, in providing the jury with proper *Kraus* instructions and further, that the trial court erred in failing to properly apply the *Kraus* factors to post-verdict review.

■ During charge conference, *Kraus* was not mentioned. However, in objecting to the court's submission on gross negligence, Mobil's counsel contended: "It would unfairly apprise the jury of—or adequately apprise the jury of exactly what is required did not impose sufficient procedural boundaries on the jury in their decision as to whether or not punitive damages should be awarded; and we would incorporate the same objection into that question that inquires as to the amount of exemplary damages to be awarded . . ." Although Mobil objected to the trial court's submission of the gross negligence issue, Mobil made no tender to the trial court of what Mobil considered to be a proper question and definition. In other words, Mobil failed to submit to the trial court a requested instruction on gross negligence covering what Mobil now contends to be the missing *Kraus* factors. Mobil further failed to request or clearly object to, or submit any requested punitive damage question.

On May 23, 1994, a hearing on Mobil's motion for new trial was held. The following colloquy took place:

MR. BAKER: Also, your Honor, we would assert that the jury was not guided by any factors with regard to establishing the amount of punitive damages.

Typically Texas Courts have focused on what they call the *Kraus* factors, which are from the *Kraus versus Alamo Heights Bank* case. In this case the jury had—had no instruction or guidelines given to them in that regard.

We believe that not only the jury should have been guided by those, but in evaluating the jury's finding of punitive damages, this Court should apply those factors or a variance of those factors in determining whether or not this award is supported in the evidence. And we would—as we asserted in our motion earlier at the hearing on the motion for judgment, we think that the Court should, in its evaluation of the gross negligence, make findings in that regard, as well as findings with regard to the punitive—the amount of the punitive damages.

THE COURT: We used—I think we used the pattern jury charge regarding the submission on gross negligence and punitive damages, didn't we?

MR. BAKER: Yes, sir.

THE COURT: Was there any objection at the time of the submission on the lack of these guidelines?

MR. BAKER: Yes, your Honor.

MR. FERGUSON: Just for the record, I'm going to disagree with that. I think the record will speak to whether or not there was any objection or any submission of *Kraus* factors, and I don't want my silence to be construed as any waiver or admission that that was done.

THE COURT: Was there an alternative charge that included those factors submitted to the Court?

MR. BAKER: I think there was an objection, your Honor. I do not think there was a submission that included those—

THE COURT: All right.

MR. BAKER:—factors.

THE COURT: Did you have any other response to that?

MR. FERGUSON: Your Honor, none' other than the fact that if the defense doesn't request any instructions, then the Court obviously is under no obligation to do so.

We submitted the case according to the pattern jury charge under the law in effect at the time the case was tried.

*Moriel* and its progeny that has followed thereafter has specifically held that if you want, for example, the *Kraus* factors, you have to preserve error; and in order to preserve error, it was incumbent upon the defendant to request the submission of the issue. And they have not done that.

I think any substantive inquiry is moot at this time until they can get over the procedural hurdle, which they cannot.

THE COURT: All right. I understand your position on that. I'll overrule that objection.

At trial, gross negligence was defined by statute as follows:

"Gross Negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the

act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.[5]

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(5).[6]

The definition of gross negligence given by the trial court tracks almost verbatim the statutory definition. We assume our State legislature, in its wisdom and its awareness of *Kraus*, was then (1987) satisfied that such definition appropriately included a consideration of *Kraus* factors. Again, Mobil failed to tender any expansion or clarification to the trial court.

## EVALUATION OF KRAUS FACTORS

■ Having determined that legally sufficient evidence supports the jury's finding of gross negligence authorizing the recovery of punitive damages, we now determine whether the amount of the award reasonably relates to Mobil's gross negligence and whether the punitive damages awarded are reasonably proportioned to actual damages. *See Kraus*, 616 S.W.2d at 910, (citing *Southwestern Inv. Co. v. Neeley*, 452 S.W.2d 705 (Tex. 1970)). Whether the amount of damages awarded by the jury is excessive is a question of fact over which our Texas Supreme Court has no jurisdiction. *Kraus*, 616 S.W.2d at 910. However, "[w]hether the Court of . . . Appeals applied an erroneous standard in determining the excessiveness of damages presents a question of law within the jurisdiction of [the Texas Supreme] Court." *Id.* at 910.

■ Intermediate Courts of Appeals are now compelled to re-review the evidence supportive of an affirmative finding of gross negligence and apply such evidence, along with any other evidence, in determining whether or not the exemplary damages awarded are reasonable. Although, in this case, we have detailed evidence supportive of both the objective and subjective prong of *Moriel*, we must now re-address such evi-

5. The present act, effective September 1, 1995, inapplicable to our present case, contains no definition of gross negligence. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001 (Vernon 1986 & Supp. 1996).

6. Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 44, *amended by* Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109.

dence as same applies to each individual *Kraus* requirement. Further, upon completion of this task, we must then clearly explain "why" such recited evidence either supports or does not support the punitive damage award. The scope and standard for reviewing punitive damage awards now exceeds original *Kraus* requirements.

Following *Kraus*, our Texas Supreme Court in *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986), set forth a standard of "detailing" relevant evidence only when the reviewing Court determined to reverse on factual insufficiency. In *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex.1993), *Pool* was expanded to require Courts of Appeals to "detail" evidence supportive of the jury's affirmative finding on an issue. Now, *Moriel* prompts the additional requirement of explaining "why" such evidence either does or does not support the punitive damage award. *Moriel*, 879 S.W.2d at 31.[7]

The major concern in *Kraus* was whether the "amount" of punitive damages was reasonable in proportion to actual damages. *Kraus*, 616 S.W.2d at 910. The five factors set forth in *Kraus* were simply factors to guide intermediate Courts of Appeals in determining whether an award of exemplary damages was reasonable. It is now clear, through *Moriel* and *Keever*, that "reasonable" is no longer the touchstone consideration. *Moriel* and *Keever*, 888 S.W.2d at 790 and 915 S.W.2d at 478.

Explaining "why" the evidence either does or does not support punitive damages re-

quires revisiting gross negligence evidence on a factual sufficiency standard.[8] In compliance, we consider relevant evidence through the guidelines enumerated in *Kraus*. The only feasible means of so doing is through a restatement of the evidence supportive of gross negligence. It shall also become necessary to restate such evidence yet a third time under the discussion of "why". We base this conclusion on our review and analysis of *Keever*, 870 S.W.2d at 63 (affirmed in part, reversed and remanded in part with instruction to reconsider punitive damage award in accordance with standards articulated in *Moriel*, 888 S.W.2d at 790); *Keever*, 913 S.W.2d at 605 (opinion on remand again remanded in *Keever*, 915 S.W.2d at 478). For clarity, when *Keever* was first remanded to the Dallas Court, that Court acknowledged:

> This case comes before us on remand to determine the sufficiency of the evidence to support the jury's award of punitive damages in light of the procedural standard set forth in *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex.1994). We detail the relevant evidence which, in our opinion, supports each factor.

*Keever*, 913 S.W.2d at 605. The Dallas Court sets forth in detail the evidence found to be sufficient to support all *Kraus* factors holding the jury's award of punitive damages was not legally excessive. On November 16, 1995, our Texas Supreme Court again reversed the Dallas Court for failure to detail all the evidence and explain "why" that evidence either supports or does not support the punitive damage award.

---

**7.** Effective September 1, 1995, Section 41.013, Tex. Civ. Prac. & Rem.Code Ann. (Vernon 1986 & Supp.1996), establishes parameters of review as to liability and exemplary damage awards. This statute omits *Moriel's* additional and problematic requirement of setting forth "why" the evidence either does or does not support an award of exemplary damages. Perhaps our State Legislature, though keenly concerned with tort reform necessary to curb excessive exemplary damage awards, is also keenly aware that when appellate courts engage in the "whys" of an award, those courts then become the "Super Jury," with power and authority to "second guess" the jury's findings.

**8.** It would appear that a detailed review of the evidence legally supportive of gross negligence would make redundant any explanation of "why"

such evidence supports punitive damages. The irony of present review is that even though the evidence is found to be legally sufficient to support a gross negligence finding, such evidence may be subsequently determined by our Supreme Court to be factually insufficient if sufficient detailing is not provided during punitive damage review. Normally then, upon review by our Supreme Court, the Court would decide whether our holding meets the standard of review required. The opinion of intermediate appellate courts "shall be conclusive on all questions of fact brought before them on appeal or error." Tex. Const. art. V, § 6. It seems clear to this Court that standards of review required in *Moriel* and *Keever* now provide that avenue by which our Texas Supreme Court may review factually insufficiency questions.

Thus, it appears that our requirement is to first detail evidence supportive of the jury's gross negligence finding; detail the evidence supportive of the jury's punitive damage finding under *Kraus;* and detail the evidence relating to "why" the evidence supports such award. In view of *Keever 's* history, we find no avenue of escape; therefore, we proceed.

## KRAUS FACTORS

### The Nature of Mobil's Wrong

Mobil's negligent conduct proximately caused Mr. Ellender's death which resulted from exposure to benzene. This of course is simple negligence and does not rise to the plateau of gross negligence. In considering the nature of Mobil's wrong, as that wrong relates to Mr. Ellender and his family, we find in the record that benzene was provided by Mobil and was used by workers to clean their hands and tools with Mobil's knowledge. Mobil knew workers such as Mr. Ellender would be exposed to benzene through their required task of opening pumps containing benzene to change seals and gaskets. In 1950, the National Safety Counsel published, "[b]ecause the appearance and pleasant smell of benzene give no warning of its toxic effect and because a victim may become incurably poisoned before he feels ill, benzene is one of the most insidious poisons ever to find wide industrial use." NATIONAL SAFETY COUNCIL, BENZENE (1950). Decades prior to Mr. Ellender's exposure to benzene on Mobil's premises, Mobil knew of the harmful effects such exposure could have. Dr. Potts, Regional Medical Director for the western region, including Beaumont, 1960–1983, knew, while he was in medical school in the 1940's, that benzene caused blood disease. Dr. Potts knew in the 1950's washing hands and tools in benzene was hazardous to workers. Dr. Potts testified he felt Mobil knew the hazards of benzene in the 1950's and admitted discussing benzene hazards with Mobil's Beaumont plant physician, Dr. Stewart, in the 1950's. While Mobil knew the dangers associated with benzene by the late 1940's and 1950's, Mobil consciously decided not to warn the workers in its Beaumont plant. Mobil's own witnesses agreed that Mobil management declined to tell them about benzene dangers in the 1960's and early 1970's. Mobil's plant doctor during the 1960's testified he knew workers used benzene to wash hands and tools and, if a worker washed his hands or tools in benzene, it indicated the worker was not properly warned of benzene hazards.

The nature of Mobil's wrong is best captured in the definition of "gross negligence." Mobil had far superior knowledge of benzene and its harmful and devastating propensities than did Mr. Ellender. This knowledge obviates any momentary thoughtlessness, inadvertence or error of judgment. The jury had before it sufficient facts to warrant finding Mobil's actions or inactions constituted an entire want of care toward persons like Mr. Ellender. The jury had sufficient evidence, both legally and factually, to conclude Mobil's conduct was the result of actual conscious indifference to the rights, safety and welfare of Mr. Ellender. The record contains legally and factually sufficient evidence to conclude Mobil's conduct constituted a flagrant disregard for the rights of Mr. Ellender and that Mobil was actually aware their acts would, in reasonable probability, result in either human death or great bodily harm. We conclude the evidence is sufficient to support an award of punitive damages under the first *Kraus* factor. Again, *Kraus,* directs its concern to the question of "reasonableness" of punitive damages while *Moriel* focuses more upon evidentiary justification for an award of punitive damages.[9]

### The Character of Mobil's Conduct

The nature and character of conduct have similar shades. A meaningful analysis of the "character" of Mobil's conduct requires a slight transformation of the word from noun to verb. We understand our obligation to be that of characterizing Mobil's conduct as evi-

---

9. It would seem that evidentiary justification *for* an award of punitive damages automatically triggers when legally sufficient evidence supports a gross negligence finding. Since the present standard of review focuses more on the "why" than the "reasonableness" of a punitive damage award our appellate procedural analysis continually returns us to re-analysis of gross negligence as opposed to the reasonableness of the award.

denced through the facts presented. Such characterization shows Mobil had an unwritten policy not to conduct benzene monitoring for workers like Mr. Ellender. Mobil's own industrial hygienist admitted personal monitoring is the only sure way to assess worker exposure to benzene. Technology for air monitoring of benzene levels has existed since the 1920's and by 1950 a variety of techniques and devices were available for benzene sampling. Mobil did no medical surveillance monitoring of contract employees such as Mr. Ellender. Mobil did not inform Mr. Ellender benzene was harmful to his health. Even in view of Mobil's superior knowledge and access to medical information regarding benzene potentials, Dr. Potts admitted Mobil believed it had no obligation to inform workers of injury-causing materials unless Mobil was 100% sure it would affect the workers. A characterization of Mobil's failure to inform workers of benzene exposure reflects Mobil's unconscionable disregard for worker safety. Mobil's knowledge and access to information relating to the hazards of benzene, coupled with its failure to warn and inform workers of such hazards, its failure to provide protective equipment, and its failure to monitor and test workers for exposure to benzene while on Mobil premises, is clearly evidence of gross negligence for which punitive damages may be awarded. The jury heard the evidence and did indeed characterize Mobil's conduct through that evidence. We conclude there is sufficient evidence to support this second *Kraus* factor.

### The Degree of Mobil's Culpability

Repetitive though it be, we must again return to the jury's findings on "gross negligence" and "malice." Culpable is defined as "blameworthy; deserving censure." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 443 (2nd ed. 1983). Culpable conduct is defined as "blamable; censurable; criminal; at fault. . . . That which is deserving of moral blame." BLACK'S LAW DICTIONARY 379 (6th ed. 1990).

The terms "gross negligence" and "malice" not only imply culpability but also require a culpable state of mind. A finding of "gross negligence" must be based on evidence showing Mobil's actual conscious indifference. A "malice" finding of flagrant disregard for the rights of others with actual awareness that the conduct will, in reasonable probability, result in either human death or great bodily harm also requires a culpable state of mind.

Taking into consideration Mobil's superior knowledge and access to medical information relating to benzene, Mobil did nothing to educate, inform, or tell contract employees what Mobil knew about benzene. It would appear as minimal responsibility on the part of Mobil to inform contract employees of the presence of benzene, the dangers associated with benzene and the high potential of their exposure to benzene while on Mobil's premises. At the very least this would have allowed workers to make some independent determination. Mobil did not provide Mr. Ellender with the information, which Mobil possessed, which would have allowed Mr. Ellender to make an independent decision.

Many witnesses testified at trial. The jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Jaffe Aircraft Corp.*, 867 S.W.2d at 28 (citing TEX.R. CIV. P. 226a). This Court cannot pass on the credibility of the witnesses nor substitute our findings for those of the jury, even if after reviewing the evidence we might have reached a different conclusion. *Precision Homes, Inc. v. Cooper*, 671 S.W.2d 924, 929 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (citing *Burchfield v. Tanner*, 142 Tex. 404, 178 S.W.2d 681 (1944)). A thorough review of this record clearly supports a finding of Mobil's culpability. Having determined the evidence sufficiently supports the jury's findings of actual conscious indifference to the rights, safety and welfare of Mr. Ellender, we determine Mobil's conduct as sufficiently culpable to satisfy prong three of *Kraus*.

### The Situation and Sensibilities of the Parties

Originally, *Kraus* factors were simply designed as guidelines in considering the "reasonableness" of the amount of punitive damages awarded by a jury. We must now

verbally articulate, in detail, how these mind-guiding factors apply.[10] Analyzing the situation and sensibilities of the parties requires delving into the minds of those jurors who heard the evidence, observed the witnesses, reviewed the exhibits, and concluded Mobil, being grossly negligent, should pay punitive damages.

Mobil not only knew benzene was present at its Beaumont plant, but knew of its dangerous qualities. Knowing the dangerous propensities of benzene, Mobil was insensitive to the potential effects benzene could have upon workers such as Mr. Ellender. Mobil made a conscious decision not to share its superior knowledge regarding benzene with Mr. Ellender and those workers similarly situated. The situation of Mr. Ellender was that of a man who performed labor for his employer in situations and conditions he believed safe. Mr. Ellender performed labor at Mobil's facility in Beaumont, Texas, without knowing exposure to benzene could ultimately result in AML. Mr. Ellender was insensible to the potential effect of benzene on the human body for lack of knowledge; Mobil was insensible to Mr. Ellender in failing to inform Mr. Ellender that exposure to benzene could ultimately result in his death by AML.

"Remorse" at trial is a factor to be considered in assessing the situation and sensibilities of the parties. *Keever,* 913 S.W.2d at 610 (citing *General Chem. Corp. v. De La Lastra,* 815 S.W.2d 750, 758 (Tex.App.—Corpus Christi 1991), *aff'd in part, rev'd in part on other grounds,* 852 S.W.2d 916 (Tex.), *cert. dismissed,* 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993)). The record is silent as to remorse on the part of Mobil, nor does Mobil challenge the factual conclusion that Mr. Ellender's death was proximately caused by exposure to benzene while employed at Mobil's facility in Beaumont, Texas. It is the conclusion of this Court the evidence was sufficient to satisfy the fourth *Kraus* factor.

### The Extent to Which Mobil's Conduct Offends a Public Sense of Justice and Propriety

Mr. Ellender died of and from acute myelogenous leukemia (AML), brought about by Mobil's negligence. Had Mobil adequately warned Mr. Ellender of benzene dangers, Mr. Ellender could have made certain independent decisions. Mr. Ellender could have refused to work where benzene was present. Mr. Ellender could have insisted his employer furnish adequate protective gear and clothing to him. Mr. Ellender could have simply chosen other employment. Mr. Ellender could have chosen not to wash his hands, tools and clothes in benzene. There are no doubt other choices Mr. Ellender could have made had he been given *proper* notice and warnings of the dangers related to benzene. Mr. Ellender did not know of these dangers. However, Mobil, according to the evidence, did know Mr. Ellender's exposure to benzene could result in his death by AML.

The record is silent as to any good faith effort by Mobil to warn or educate Mr. Ellender as to what Mobil knew to be the dangers associated to benzene. In discussing the extent to which Mobil's conduct would offend the public sense of justice and propriety, we engage in a bit of historic storytelling. In Texas, certain Texans have annually engaged in what is referred to as "Rattlesnake Roundup." This "Roundup" normally occurs in those geographic regions of Texas where rattlesnakes are known to habitate. Many fearless Texans engage in the activity of "catching" large numbers of rattlesnakes. No doubt, throughout the years of this annual tradition, certain participants have been bitten by these very poisonous creatures. One thing is quite clear regarding the roundup and capture of rattlesnakes—the participants well know the potential dangers associated with being bitten by a rattlesnake. These "Roundup" participants make an independent choice and decision to engage in this

---

10. In discussing all *Kraus* factors, we cannot avoid doing that which is prohibited, *i.e.,* determining whether this Court shall substitute its judgment for that of the jury. *See Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.1987). In *Crawford v. Standard Fire Ins. Co.,* 779 S.W.2d 935, 941 (Tex.App.—Beaumont 1989, no writ), this Court stated: "[t]he jury's verdict, in Texas Courts, has a special, significant sacredness and inviolability." We may not second guess the factfinder. *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 387 (Tex.1989).

potentially dangerous activity. Even though participants may occasionally be injected with poisonous venom from these reptiles, their voluntary participation in the affair does not constitute conduct offending the public's sense of justice and propriety. What would offend the public's sense of justice would be to invite or encourage participants to the "Roundup" who have absolutely no awareness of the dangers associated with the handling of rattlesnakes.

"[B]enzene is one of the most insidious poisons ever to find wide industrial use" and "a victim may become incurably poisoned before he feels ill ..." NATIONAL SAFETY COUNCIL, BENZENE (1950). In most cases, the human body does not respond instantly to an invasion of benzene through breathing or touching. Whereas the insidious effect of benzene may lay in wait for many years, the invasion of rattlesnake venom in the human body produces an immediate effect. Though the nature and appearance of the rattlesnake is stealthy, its bite produces instant results. To have upon one's premises "one of the most insidious poisons ever to find wide industrial use," presenting the potential for a victim to become "incurably poisoned," is conduct offensive to a public sense of justice and propriety. Had Mr. Ellender known of the dangers associated with benzene, Mr. Ellender could have taken safety measures. Mr. Ellender was injected with an insidious poison while on Mobil's premises, while Mobil knew not only of its presence, but its dangerous and sometimes devastating effects. We hold the evidence sufficiently satisfies the fifth *Kraus* factor.

### WHY

Prior to *Moriel*, appellate court scrutiny regarding factual insufficiency questions was limited to a detailing of evidence relevant to an issue, clearly stating why the evidence was factually insufficient to support the jury's finding or was so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool*, 715 S.W.2d at 635. Now, "when conducting a factual sufficiency review of a punitive damages award," we must "detail the relevant evidence" in our opinion "explaining why that evidence either supports or does not support the punitive damages award in light of the *Kraus* factors." *Moriel*, 879 S.W.2d at 31.

The original *Pool* requirement is defensible; for if an intermediate appellate court determines against the verdict, it is only reasonable and right that the court explain "why" the evidence does not support the jury's finding. The *Pool* standard of review heightened the historical and traditional sanctity given jury verdicts. We proffer the *Pool* requirement was designed to prevent reviewing courts from becoming "super jurors" thereby substituting its factual determination for that of the original jury. *Moriel* takes our reviewing standards much further by requiring reviewing courts to detail relevant evidence supportive of the jury's findings. We perceive a great difference between explaining "why" the evidence *is not sufficient* to support a jury's finding and explaining "why" the evidence *is sufficient* to support a jury's finding. This expanded procedural review microscopically does that which has been constitutionally and statutorily prohibited. *See* TEX. CONST. art. V, § 6; TEX. GOV'T CODE ANN. § 22.225(a) (Vernon 1988).

"Why," is defined as "for what reason, cause, or purpose; with what motive; ... because of which; on account of which; ... the reason for which." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 2090 (2nd ed. 1983).

In addressing the question of "why" relevant evidence supports the jury's punitive damage award, we cannot escape a subjective consideration of how the jury evaluated the credibility of the many witnesses who testified in this cause. Nor can we avoid subjectivity in arriving at the "weight" the jury gave the respective testimony.

### Why the Nature of Mobil's Wrong Supports Punitive Damages

Mobil provided benzene to workers such as Mr. Ellender to be used, and allowed to be used, for several purposes. Workers such as Mr. Ellender were known by Mobil to use benzene to cleanse their hands, tools and clothing. Evidence shows that workers such as Mr. Ellender were required to perform

tasks subjecting them to benzene exposure such as opening pumps containing benzene in order to change seals. Evidence clearly establishes Mobil knew benzene was "one of the most insidious poisons ever to find wide industrial use." The record is replete with evidence of Mobil's knowledge, through its medical staff and personnel, that benzene not only was hazardous to the health of individuals but was a contributing cause of AML. We conclude there is sufficient evidence that the nature of Mobil's wrong supports punitive action. Having heard all the testimony and having reviewed all the evidence, the jury concluded plaintiffs were entitled to punitive damages. The jury's determination that Mobil's negligence was "gross" and was justified.

## Why the Character of Mobil's Conduct Justifies Punitive Damages

The jury heard evidence of Mobil's "unwritten" policy to not conduct benzene monitoring for workers such as Mr. Ellender. The jury heard Mobil's own industrial hygienist admit personal monitoring was the only sure way to assess worker exposure to benzene. Evidence established Mobil had adequate monitoring technology to perform these tests on workers such as Mr. Ellender. Mobil chose not to conduct surveillance monitoring of employees such as Mr. Ellender. The evidence of Mobil's failure to warn workers like Mr. Ellender of the potential dangers of benzene constitutes evidence highly supportive of the award of punitive damages. The jury heard testimony Mobil believed it had no obligation to inform workers of injury-causing materials unless Mobil was one hundred percent sure it would affect the workers. The jury heard testimony and reviewed evidence regarding Mobil's knowledge and access to knowledge relating to benzene hazards, its failure to warn and inform workers of these hazards, and its failure to provide protective equipment and conduct monitoring. From the evidence, which was sufficient in nature, the jury concluded punitive damages should be awarded. We hold there exists sufficient reason, purpose and cause ("why") for the jury to award punitive damages.

## Why the Degree of Mobil's Culpability Justifies Punitive Damages

The jury heard evidence relating to Mobil's superior knowledge and access to medical information relating to benzene. The jury heard no evidence regarding Mobil's effort to educate, inform, or share its superior knowledge with employees such as Mr. Ellender. The jury heard evidence of Mobil's failure to meet even minimal responsibility to contract employees by informing them of dangers associated with benzene. Mobil offered employees such as Mr. Ellender no educated opportunity for independent choice regarding their exposure to benzene. In weighing evidence of Mobil's culpability, the jury concluded such culpability justified punitive damages. We find the evidence sufficiently supportive of good reason, cause and purpose for the jury's awarding punitive damages.

## Why the Situation and Sensibilities of the Parties Justify Punitive Damages

The jury, having heard and reviewed all of the evidence must have been keenly aware of the disparity between Mobil's knowledge of the dangers related to benzene, as opposed to Mr. Ellender's apparent total lack of knowledge regarding its dangerous effects. The jury was able, through the evidence, to discern that Mobil controlled the poison which ultimately took Mr. Ellender's life. The jury heard no evidence of remorse on the part of Mobil and must have concluded, justifiably so under the record, that the award of punitive damages was supported by reason, cause and purpose. We hold the evidence clearly supports the jury's reason, cause and purpose of awarding punitive damages.

## Why Mobil's Conduct Offends a Public Sense of Justice and Propriety

The jury heard evidence supportive of their finding that Mr. Ellender died from AML as a result of Mobil's negligence. The jury heard evidence regarding the insidious nature of benzene and its deadly effect that may lay-in-wait for years. The jury was

able, through the evidence, to attribute Mobil's conduct as "grossly negligent" conduct supportive of punitive damages. We hold the evidence supplied sufficient reason, cause and purpose as to "why" the jury awarded punitive damages.

## REASONABLENESS OF PUNITIVE DAMAGES

 The jury awarded appellees the sum of $622,888.97 in actual damages. The jury also awarded appellees the sum of $6,000,000 as exemplary or punitive damages. Trial judge, Michael Bradford, applying the punitive damage "cap," reduced the jury's punitive damage award by approximately 2.5 million dollars. In view of a malice finding supported by evidence, "capping" of punitive damages is unnecessary. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 41.007 and 41.008.[11] Appellees make no challenge to the trial court's "capping" of punitive damages. By judgment, appellees were awarded $3,358,-954.50 in exemplary or punitive damages. Thus, the trial court reduced the jury's award by $2,641,045.50.

 Mobil contends the evidence is legally and/or factually insufficient to support these punitive damages. We disagree. The facts, both legally and factually, support the jury's findings of gross negligence under a *Kraus* evaluation. Furthermore, in "capping" the punitive damage award, the trial court applied TEX. CIV. PRAC. & REM.CODE ANN. § 41.007 allowing exactly four times the amount of actual damages. Mobil seeks a reformation of judgment to reduce exemplary damages by at least $958,954.60. Such request shall be further addressed under points of error fifteen and sixteen.

 Mobil does not address the amount of compensatory damages per se. However, by points of error thirteen and fourteen, Mobil contends the trial court erred in failing to allow Mobil certain settlement credit. Mobil's primary complaint relates to the award and the amount of such award of exemplary damages. When evidence is legally sufficient to support a finding of gross

negligence, the justification for awarding exemplary damages becomes automatic to the point that should a jury find gross negligence and fail to find punitive damages, such finding would demand serious appellate scrutiny. Having determined factual justification for an award of exemplary damages, and finding no trial court error in its statutory "capping" of exemplary damages, we overrule Mobil's points of error of no evidence or legally insufficient evidence. We cautiously determine that at this point there is no need to again address previously recited evidence. Appellant's points of error five, six, nine, and eleven are overruled.

Point of error twelve addresses the constitutionality of the "Texas system for awarding and receiving exemplary damages in general and as applied in this case." Mobil contends it has been deprived of necessary procedural and substantive safeguards against unreasonable exemplary damages. Our holdings in this case obviate the need for detailed address to point of error twelve, thus, it is overruled.

BURGESS and STOVER, JJ., join.

## PART II

### SETTLEMENT CREDIT

Points of error thirteen and fourteen address the trial court's failure to properly apply settlement credit and the overruling of Mobil's motion for leave to amend its pleadings or to file a trial amendment to plead entitlement to a settlement credit.

On December 1, 1993, prior to submission to the jury on December 2, 1993, Mobil filed a pleading which stated in relevant part:

### ELECTION OF DOLLAR FOR DOLLAR CREDIT

... Mobil ... requests that a dollar for dollar credit be applied to any recovery made on behalf of the Plaintiffs. This election is being made pursuant to § 33.014(a) of the Texas Civil Practice and Remedies Code.

---

11. Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 46, *amended by*

Act of April 20, 1995, 74th Leg. R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 111–112.

By this election, Defendant requests that any judgment rendered against this Defendant be reduced by the sum of the dollar amounts of all settlements received by the Plaintiffs, as allowed for under § 33.012(b)(1) of the Texas Civil Practice and Remedies Code.

Non-suit of the "settling defendants" was signed January 6, 1994, and filed January 10, 1994. Motion for Judgment was filed February 2, 1994, and heard on February 9, 1994. At this hearing, Mobil made no effort to present evidence of the settlement. The only place "the settlement" appears of record is the "Full Release and Indemnity Agreement" dated December 28, 1993, which was attached to Mobil's motion for new trial. This "settlement" was not introduced into evidence.

Plaintiffs' live pleadings against Mobil and the "settling defendants" included claims for both actual and punitive damages. While the "settlement agreement", which was never admitted into evidence, reflected a gross settlement of $500,000, the "settlement agreement" made no allocation of the funds between actual and punitive damages.

Before the trial court, appellees, plaintiffs below, argued Mobil failed to present proof of allocation of the $500,000 settlement as between compensatory and punitive damages. Plaintiffs contended: "... if the defendant does not allocate and demonstrate to the Court which is which, then the Court simply doesn't have the evidence to make that determination...." Mobil admitted no settlement credit can be given for punitive damages. Mobil's counsel stated: "Judge, I'll agree that we're not entitled to a credit on punitive damages." Mobil did contend, however, its absolute right to settlement credit in the sum of $500,000 as a reduction to the amount of actual damages awarded by the jury in the sum of $622,888.97. Mobil contends the plain wording of Chapter 33, TEX. CIV. PRAC. & REM.CODE ANN., compels a credit for settlements by defendants who promised to pay money to plaintiffs in consideration for potential liability.

TEX. CIV. PRAC. & REM.CODE ANN. § 33.014 [12] provides:

(a) If a claimant has settled with one or more persons, an election must be made as to which dollar credit is to be applied under Section 33.012(b). This election shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and, when made, shall be binding on all defendants. If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subdivision (2) of Section 33.012(b).

TEX. CIV. PRAC. & REM.CODE ANN. § 33.012 [13] provides:

(a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following, as elected in accordance with Section 33.014:

(1) the sum of the dollar amounts of all settlements; or

. . . .

The trial court disallowed any settlement credit to Mobil. Appellees argue the trial court was correct because Mobil made no attempt to present evidence of the settlement and the "Full Relief and Indemnity Agreement" dated December 28, 1993, was never introduced into evidence. Further, appellees contend the trial court correctly disallowed credit because Mobil failed to make any allocation or distinction of the $500,000 settlement as between actual or punitive damages. Appellees' basic position is that simply filing an election pursuant to section 33.014, in and

---

**12.** Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.10 1987 Tex. Gen. Laws 43, *amended by* Act of May 18, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 975.

**13.** Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.08 1987 Tex. Gen. Laws 41–42, *amended by* Act of May 18, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 974.

of itself, preserves nothing for the non-settling defendant or defendants, unless, such election is ultimately offered and admitted into evidence, setting out succinctly, whether such settlement amount applies to actual damages, punitive damages, or both.

Mobil timely filed its election of credit for settlement requesting "a dollar for dollar credit be applied to any recovery made on behalf of the Plaintiffs," and that "any judgment rendered against [Mobil] be reduced by the sum of the dollar amounts of all settlements received by the Plaintiffs."

■■■ Section 33.014 is mandatory and once Mobil made its written election the trial court was required to reduce the final judgment by the amount of all settlements. Our state legislature is presumed to intend the plain language of its legislative enactments and a reviewing court must give effect to the legislature's intent. *See Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 280 (Tex. 1994).

On November 24, 1993, during trial and prior to submission of the case to the jury on December 3, 1993, we find the following colloquy:

Mr. Hyde (Plaintiffs' Counsel): Your Honor, there is a matter of settlement. A number of defendants that were in this case *have settled,* and I suppose Mr. Baker could probably announce who has settled.

Mr. Baker (Mobil's Counsel): Your Honor, the defendants Texaco and its entities; the defendant Chevron; defendant Fina or American Petrofina, whatever their name is; and Arco, Atlantic Richfield Company, *have settled with the plaintiffs for $500,-000.*

And I believe—have they sent y'all the papers yet?

Mr. Hyde: No.

Mr. Baker (Mobil's Counsel): I guess they're still being—settlement papers are still being drafted. I know that I received drafts, and you should be getting them pretty soon.

Mr. Oliver: And the settlement flows also to the predecessors of at least some of those defendants. For example, Gulf Oil Corporation will also get a release; and they were a defendant here.

Mr. Ferguson (Plaintiffs' counsel): *We just wanted to have that on the record* so that—

The Court: Since they're named parties in this lawsuit?

Mr. Ferguson: Correct.

■■■ This unequivocal representation to the Court, along with appellees' Motion to Restyle because "[p]laintiffs have settled and compromised their claims against the styled defendant, Texaco, Inc., and all other original defendants in this lawsuit with the exception of [Mobil]" constitutes a judicial admission that a settlement existed. *See Roach v. Roach,* 735 S.W.2d 479, 482 (Tex.App.—Houston [1st Dist.] 1987, no writ). We reject appellees' contention that the section 33.014 Election of Credit was not properly before the court.

■■■ The plain language of section 33.014 requires only the filing of a "written election" for entitlement to settlement credit. Obviously, this election must be made timely, i.e., "before the issues of the action are submitted to the trier of fact...." Once such election is made, it becomes binding on "all defendants." Even had Mobil failed to make its election for credit pursuant to section 33.014, the trial court was required, at a minimum, to apply a sliding scale credit under sections 33.012(b)(2) and 33.014. *See Texas Cab Co. v. Giles,* 783 S.W.2d 695, 697 (Tex.App.—El Paso 1989, no writ). Appellees contend "[c]ommon practice dictates that a settlement subject to a § 33.014 election must be proven up **and** that there must be pleadings claiming such." Section 33.014 is silent as to whether a non-settling defendant must "plead" its entitlement to settlement credit. We do not read section 33.014 as requiring a pleading. Though a "written election" under section 33.014 may constitute a form of pleading, we do not believe the enactment of section 33.014 requires technical compliance with TEX.R. CIV. P. 45. Section 33.014 requires the filing of a "written election" which obviously must be brought to the attention of the trial court. In the present case, the trial court was aware of Mobil's request for settlement credit in four ways: plaintiffs' judicial

admissions they had settled with the other defendants; plaintiffs' acknowledgment in open court of their settlement with the other defendants; plaintiffs' failure to obtain a verdict against the other defendants; and Mobil's written opposition to plaintiffs' motion for judgment, which attached a certified copy of Mobil's written election.

Although Mobil was not required to file a "pleading," Mobil nevertheless filed a motion for leave to file a trial amendment pleading settlement credit. The trial court denied this motion; such denial being immaterial since no "pleading" was necessary. Again, even had Mobil failed to file its "written election", the trial court, being aware of the settlement and its amount, was required to comply with section 33.012(b).

Thus, the question is not whether Mobil properly elected a credit under TEX. CIV. PRAC. & REM.CODE ANN. §§ 33.014(a) and 33.012(b)(1) but did Mobil properly claim that credit. Expressed another way, what procedure was required to supply the court "the sum of the dollar amounts of all settlements." [14]

Our highest court has never expressly enunciated what is required for providing the court the amount to be credited. However, in *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78–79 (Tex.1993) they stated: "Any party seeking the benefit of a settlement credit has the burden of establishing that it is entitled to such a reduction in the amount of the judgment." (citing *Hill v. Budget Fin. & Thrift Co.*, 383 S.W.2d 79, 82 (Tex.Civ.App.—Dallas 1964, no writ). The court noted the settlement agreement had been "placed into the record." *Id.* at 79.

*Hill*, 383 S.W.2d at 82–83, stated:

> The burden of proof was undoubtedly upon appellees Safeway–Connell to establish the proper amount of credit to be applied to the actual damage verdict, thus reducing their liability.... Having pleaded for the relief, and the burden being upon them, we now consider the evidence to determine whether Safeway–Connell satisfied the burden of proof.... [I]t is without dispute that the burden was upon them to

prove the proper amount of damages sought to be credited to them....

Thus, in the context of "burden of proof" and "burden ... to prove", it is a logical inference that defendants seeking a credit are obliged to offer the trial court evidence of "the sum of the dollar amounts of all settlements." This may be done in the manner other operative facts are proven, through a judicial admission, a stipulation, a request for judicial notice or properly admitted documents or testimony. The comments of Mobil's attorney were none of these, they were simply "lawyer talk", not evidence, which does not provide the necessary basis of proof.

In the colloquy relied upon by Mobil, the plaintiffs did not admit "a $500,000.00 settlement existed." The plaintiffs' attorney did admit a settlement existed and noted Mobil's attorney could announce who has settled. Mobil's attorney then named four defendants who had settled for $500,000. The plaintiffs' attorney made no comment concerning the settlement amount. Mobil characterizes this silence as an admission or an acknowledgment. It is neither. There being no evidence of "the sum of the dollar amounts of all settlements", we uphold the trial court's disallowance of any settlement credit. Points of error thirteen and fourteen are overruled.

Mobil's fifteenth point of error asserting prejudgment interest should be calculated on the actual damages found by the jury after applying the settlement credit is therefore overruled.

STOVER, J., joins

## PART III

### PREJUDGMENT INTEREST

In point of error sixteen Mobil challenges the trial court's overruling its motion to modify, correct or reform the judgment on the basis the trial court erroneously added prejudgment interest to the actual damages found by the jury and then applied the exemplary damage cap of four times the actual

---

**14.** TEX. CIV. PRAC. & REM CODE ANN. § 33.012(b)(1).

damages. Interestingly, eleven years following *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), which has generated numerous interpretive offerings, there remains an absence of "bright line" guidance to the query: Does the trial court's inclusion of prejudgment interest in actual damages awarded by the jury, prior to "capping," violate either statutory or common law prohibition against the recovery of prejudgment interest on exemplary damages?

To date, the most direct address to this question comes via footnote from *Wheelways Ins. Co. v. Hodges,* 872 S.W.2d 776 (Tex. App.—Texarkana 1994, no writ). We find the *Hodges* footnote worthy of recitation:

> Section 41.007 of the Civil Practice and Remedies Code provides that 'exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater.' TEX. CIV. PRAC. & REM.CODE ANN. § 41.007 (Vernon Supp.1994). The trial court included prejudgment interest in the amount of actual damages on which the exemplary damages cap was calculated.
>
> Prejudgment interest may not be assessed or recovered on an award of exemplary damages. TEX. CIV. PRAC. & REM. CODE ANN. § 41.006 (Vernon Supp.1994); *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 555 (Tex.1985). Adding prejudgment interest to the amount of the actual damages award and then imposing the statutory cap on this aggregate amount, as the trial court did in this case, yields the same result forbidden by the supreme court when it said prejudgment interest could not be awarded on punitive damages. *Benefit Trust Life Ins. Co. v. Littles,* [869 S.W.2d 453, 473 (Tex.App.—San Antonio 1993), *vacated for settlement,* 873 S.W.2d 704 (1994) ]. Awarding exemplary damages on prejudgment interest circumvents the Civil Practice & Remedies Code and the supreme court's holding in *Cavnar.* ...

*Id.* at 783 n. 8.

We have no disagreement with our Texarkana Court, provided interest on awards of actual damages in personal injury or wrongful death cases is indeed interest only and not damages. In *Cavnar,* Justice Gonzalez made clear the term "interest" encompasses two distinct forms of compensation. *Cavnar,* 696 S.W.2d at 551.

> Interest as interest is compensation allowed by law or fixed by the parties for the use or detention of money. 1 R. McDonald, *Texas Civil Practice in District and County Courts* § 1.11 (rev.1981). Interest as damages is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.

*Cavnar,* 696 S.W.2d at 552 (emphasis added).

The concern of the *Cavnar* Court was establishing a distinction between interest as interest (*eo nomine*) and interest as damages. "The primary objective of awarding damages in civil actions has always been to compensate the injured plaintiff, rather than to punish the defendant." *Cavnar,* 696 S.W.2d at 552. If the awarding of damages in personal injury or wrongful death actions are designed to compensate for the injuries or death, and "complete indemnity" does not occur until interest as damages are applied, then full compensation for actual damages has not occurred. The *Cavnar* Court, reasoning without benefit of TEX.REV.CIV. STAT. ANN. art. 5069–1.05 § 6(a) (Vernon 1987 & Supp.1996), determined on equitable principles "that an award of prejudgment interest is necessary to order to fully compensate an injured plaintiff." *Id.*

> It is true that interest, strictly speaking, exists only by statutory law, but it is likewise true that courts have recognized the fact that compensation for detention of that which is due on account of injury inflicted is an element of damages necessary to complete indemnity of the injured party.

*Id.* (emphasis added) (quoting *Watkins v. Junker,* 90 Tex. 584, 40 S.W. 11 (Tex.1897)).

· In support of equitable reason to allow prejudgment interest on actual damages resulting from personal injuries, the *Cavnar* Court relied upon *Heidenheimer v. Ellis* for the proposition that:

Interest cannot be allowed eo nominee unless expressly provided for by statute, but in many instances it may be assessed as damages when necessary to indemnify the party for an injury inflicted by his adversary, though the statute be silent upon the subject.

*Cavnar*, 696 S.W.2d at 552 (quoting *Heidenheimer v. Ellis*, 67 Tex. 426, 428, 3 S.W. 666, 667 (1887)).

■ In personal injury and wrongful death cases, our system of laws are designed to provide a monetary equivalent to the injury or loss. Prior to *Cavnar*, personal injury and wrongful death victims did not receive a monetary equivalent to their actual damages absent an application of prejudgment interest. Justice Gonzalez writes:

> The time has come to revise the prejudgment interest rule to make injured parties whole and restore equity and symmetry to this area of the law. We therefore hold that, as a matter of law, a prevailing plaintiff may recover prejudgment interest.

*Cavnar*, 696 S.W.2d at 553–554. Obviously, *Cavnar* does not answer or address our preceding query.

In arriving at its judgment, our trial court calculated prejudgment interest on the amount of actual damages assessed in the verdict, added this prejudgment interest to the assessed damages to arrive at the total amount of "actual damages," then applied the punitive damage "cap." [15]

■ In 1988, our Supreme Court decided the case of *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129 (Tex.1988). In *Vail*, the insured brought action against the insurer under the Deceptive Trade Practices Act for insurer's failure to pay under the policy. Our highest court reversed the Dallas Court of Appeals in part and rendered judgment, "that the Vail's recover treble the amount of

the policy, prejudgment interest on the amount of the policy only, and attorney's fees." *Id.* at 137.

In 1992, our Austin Court of Appeals in *Celtic Life Ins. Co. v. Coats*, 831 S.W.2d 592, 599 (Tex.App.—Austin 1992) *aff'd in part, rev'd in part*, 885 S.W.2d 96 (Tex.1994), reviewed a purported conflict between *Vail* and the Austin Court's prior opinion in *Paramore v. Nehring*, 792 S.W.2d 210 (Tex.App.—Austin 1990, no writ). In *Paramore*, the Austin Court determined it proper to include prejudgment interest in arriving at actual damages prior to trebling. In distinguishing *Vail* and *Paramore*, the *Celtic Life* Court reconciles the "apparent conflict" between these two cases:

> The confusion stems from the two principles underlying these cases. On the one hand, prejudgment interest may not be awarded on punitive damages. *See Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 555 (Tex.1985). On the other, "actual damages," which has been held to include prejudgment interest, are subject to being trebled under the DTPA. *See Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 25 (Tex. 1987); *see also American Baler Co. v. SRS Systems, Inc.*, 748 S.W.2d 243, 250 (Tex.App.1988, writ denied).

In *Vail*, the trial court erroneously trebled the amount of damages assessed by the jury, then calculated prejudgment interest on that amount. The supreme court, relying on *Cavnar*, held that it was improper to calculate prejudgment interest on the trebled amount of damages.

Without distinguishing *Vail*, this Court held in *Paramore* that prejudgment interest, being an element of actual damages, is subject to being trebled under the DTPA. The reasoning applied in *Paramore* is concisely discussed in one commentary as follows:

---

15. In an era of progressive demand for "tort reform," intermediate courts of appeals are occasionally caught between two straits: following what seems to be the natural progression of law and favoring, albeit subjectively, present philosophical leanings. The issue presently before us is compelling. Philosophically, with "tort reform" mind set, we lean restrictively toward the disallowance of interest on the actual damages

prior to "capping." On the other hand, if a claimant cannot be made whole without the application of pre-judgment interest, judicial honesty tends to dictate that it is the combination of the actual damages awarded by the jury plus the trial court's adding of pre-judgment interest which properly reflects claimant's actual damages.

Recognizing that actual damages recoverable under the DTPA are those damages recoverable at common law, the court [in *Paramore* ] relied on the long standing rule that interest as "compensation for detention of that which is due on account of injury inflicted" constitutes common law damages. Such interest thus constitutes actual damages under the DTPA, which may be trebled in appropriate cases.

Michael Curry & Melissa Krakauer, *Deceptive Trade Practices and Commercial Torts*, 45 Sw.L.J. 319, 324 (1991).

In fact, there is no conflict between *Vail* and *Paramore;* although the "bottom line" amount of damages recovered may be the same, the process is distinguishable. The proper process for calculating treble damages under the DTPA without violating the prohibition of *Vail* is to (1) calculate prejudgment interest on the amount of damages assessed in the verdict, (2) add prejudgment interest to the assessed damages to arrive at the total amount of "actual damages," then (3) treble that sum as appropriate.

Subsequently, our Supreme Court granted writ and reversed in part without discussion of prejudgment interest. *Celtic Life Insurance Co.*, 885 S.W.2d at 96.

In 1993, our San Antonio Court of Appeals reviewed the Austin Court's holdings in *Celtic Life* and *Paramore,* determining that these court of appeals cases conflict with *Vail 's* "unequivocal language of forbidding the award of prejudgment interest on punitive damages." *Benefit Trust Life Ins. Co. v. Littles,* 869 S.W.2d 453, 473 (Tex.App.—San Antonio 1993) *vacated for settlement,* 873 S.W.2d 704 (1994). Citing *Cavnar,* our San Antonio Court states, "[t]he purpose of awarding prejudgment interest is to compensate the injured plaintiff for lost use of money due as damages between the accrual of the claim and the judgment." *Benefit Trust Life,* 869 S.W.2d at 473 (emphasis added). Our disagreement with the San Antonio Court is in its conclusion, "[t]hat objective is achieved when prejudgment interest is added to the amount of actual damages before they are trebled. Thereafter, the measure of ac-

tual damages, without including prejudgment interest, is tripled in accordance with art. 21.21 to punish the defendant for a knowing violation of the Insurance Code." *Id.*

In *Southern Life & Health Ins. Co. v. Alfaro,* 875 S.W.2d 740, 748 (Tex.App.—San Antonio 1994, no writ), the San Antonio Court continued its disagreement with the Austin Court's holdings in *Celtic Life* and *Paramore,* stating, "[t]he holding of *Vail* is clear; the plaintiff was entitled to treble the amount of actual damages, with prejudgment interest on the amount of actual damages only." *Id.* (citing *Vail,* 754 S.W.2d at 130).

The confusion is ongoing as evidenced by the present case. Trial courts are in dire need of clear case law direction. Again, if a claimant's actual damages cannot be made whole without the inclusion of prejudgment interest, then logically, actual damages should be the total sum of the verdict plus prejudgment interest calculated and added by the trial court. We believe this position to be further supported by *Potomac Ins. Co. v. Howard,* 813 S.W.2d 557, 558 (Tex.App.—Houston [14th Dist.] 1991, no writ), which provides:

The primary objective of awarding damages in civil actions is to compensate the injured plaintiff, rather than to punish the defendant. W. Keeton, et al., *Prosser and Keeton on the Law of Torts* § 2 (5th ed. 1984). A law that denies recovery of prejudgment interest frustrates this goal. *Cavnar,* 696 S.W.2d at 552. If a judgment provides plaintiffs only the amount of damages sustained at the time of the incident, plaintiffs are not fully compensated. *Id.* They have been denied the opportunity to invest and earn interest on the amount of damages between the time of the occurrence and the time of judgment.

We could perhaps engage in the fruitless endeavor of distinguishing *Vail* from our present situation by concluding *Vail* is applicable only in cases involving Deceptive Trade Practices Act and Insurance Code violations. We choose against such distinction and hold the same rule applicable to trebling under the DTPA applies in cases relating to personal injury or wrongful death.

Though we believe *Vail* to be a limitation of *Cavnar*, we cannot ignore its application. Therefore, we hold the trial court erred by adding prejudgment interest to actual damages found by the jury, then multiplying that sum by four. Appellant's point of error sixteen is sustained.

STOVER, J., joins.

BURGESS, J., dissents.

## PART IV

### JUDGMENT OF THE COURT

Having determined trial court error in failing to properly apply prejudgment interest, we remand this cause to the trial court for entry of judgment not inconsistent with following instructions:

Appellees' actual damages shall be $622,-888.97;

Appellees' prejudgment interest shall be $248,896.76;

Appellees' punitive/exemplary damages shall be four times $622,888.97, totalling $2,491,555.88.

The trial court is further instructed to award such actual damages, prejudgment interest and punitive/exemplary damages according to those percentages and proportions set forth in trial court judgment signed March 14, 1994.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

### DISSENT TO PART II—SETTLEMENT CREDIT

I respectfully disagree and dissent from Justice Burgess' analysis regarding settlement credit. Justice Burgess has done an excellent job setting forth the background preceding the trial court's ruling, now challenged by Mobil's points of error thirteen and fourteen.

It seems somewhat illogical to require Mobil to prove an uncontested point. Appellees' counsel, Mr. Hyde, represented to the trial court that "a number of defendants that were in the case have settled...." Whereupon, counsel for Mobil announces not only who the settling defendants were but also the amount of $500,000. The amount was never put in issue by plaintiffs. Thus, the trial court was aware of Mobil's request for settlement credit in four ways: plaintiffs' judicial admissions they had settled with the other defendants; plaintiffs' acknowledgment in open court of their settlement with the other defendants for $500,000; plaintiffs' failure to obtain a verdict against the other defendants; and Mobil's written opposition to plaintiffs' motion for judgment, which attached a certified copy of Mobil's written election.

I would sustain Mobil's points of error thirteen and fourteen.

### DISSENT TO PART III— PREJUDGMENT INTEREST

BURGESS, Justice, delivered the opinion of the Court as to Part II, joined by STOVER, Justice.

I respectfully dissent to the majority's disposition of point of error sixteen concerning the prejudgment interest. The majority, relying primarily upon *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129 (Tex. 1988), holds prejudgment interest should not be included in "actual damages" for the purpose of applying the punitive damages "cap".[1]

Chapter 41 of the Texas Civil Practice and Remedies Code, previously consisting of sections 41.001 to 41.009,[2] was amended by Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 TEX. GEN. LAWS 108. There were some significant changes. For exam-

---

1. In footnote 15, in Part III, the majority, very candidly, honestly and refreshingly, present a dilemma between "judicial honestly" and "following what seems to be the natural progression of law and favoring ... present philosophical leanings.... Philosophically, with "tort reform" mind set, we lean restrictively toward the disallowance of interest...." I am unsure the majority is saying "judicial honesty", in this case, must be sacrificed in order to be affirmed by our present supreme court. If so, I opt for judicial honesty, regardless of the consequences.

2. This chapter was added by Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 TEX. GEN. LAWS 44, 46, eff. Sept 2, 1987.

ple, section 41.008(b) now limits exemplary damages to an amount equal to the greater of (1) two times the amount of economic damages, plus an amount equal to any non-economic damages found by the jury, not to exceed $750,000; or (2) $200,000. Current section 41.001(4) defines "economic damages" as "compensatory damages for pecuniary loss; the term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship or society." Former section 41.007 limited exemplary damages to four times the amount of actual damages or $200,000, whichever was greater. Former section 41.006 prohibited assessing or recovering prejudgment interest on an award of exemplary damages. Current section 41.007 carries the same prohibition.

As noted by the majority, *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551–552 (Tex.1985) recognized "interest" encompasses two distinct forms: compensation allowed by law or fixed by the parties for the use or detention of money (interest as interest) or compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment (interest as damages).

*Cavnar* went on to declare:

The primary objective of awarding damages in civil actions has always been to compensate the injured plaintiff, rather than to punish the defendant. A law that denies recovery of prejudgment interest frustrates this goal. If a judgment provides plaintiffs only the amount of damages sustained at the time of the incident, plaintiffs are not fully compensated. They have been denied the opportunity to invest and earn interest on the amount of damages between the time of the occurrence and the time of judgment.... The time has come to revise the prejudgment interest rule to make injured parties whole and restore equity and symmetry to this area of the law. We therefore hold that, as a matter of law, a prevailing plaintiff may recover prejudgment interest compounded

daily (based on a 365–day year) on damages that have accrued by the time of judgment. To the extent that other cases conflict with this holding, they are overruled.... In addition to achieving full compensation, awarding prejudgment interest in personal injury cases at a rate close to the market rate will also serve to expedite both settlements and trials. It will remove the current incentives for defendants to delay as long as possible without creating incentives for plaintiffs to delay.

696 S.W.2d at 552–554 (citations and footnotes omitted). The court was also aware of legislative versus judicial action when it stated:

Some assert that it would be preferable for the legislature to promulgate a definitive plan aimed at solving the many problems plaguing this area of the law rather than to attempt to judicially resolve the issues on a case by case basis. However, we have judicially awarded prejudgment interest in certain cases and denied it in others. It is, therefore, both necessary and appropriate for us to modify this area of the law in order to eliminate the existing inequities.

696 S.W.2d at 556.

The Legislature enacted chapter 41 in the summer of 1987, a full two years after *Cavnar,* and met again in 1989, 1991 and 1993 before the 1995 amendments. During this time at least a half-dozen cases were decided paraphrasing the *Cavnar* concept as "prejudgment interest being a part of actual damages", yet the Legislature did not define "actual damages" in the statute nor codify any relationship between prejudgment interest and actual damages.

In *C.T.W. v. B.C.G.,* 809 S.W.2d 788, 794 (Tex.App.—Beaumont 1991, no writt)[3], this court discussed the interplay of judicial interpretations and legislative action:

Though part of the damages may have not accrued at time of trial, the legislature clearly has decided to allow parties to recover pre-judgment interest on the entire judgment. We must presume they were aware of the *Cavnar* decision when they

3. This case involved the propriety of prejudg- ment interest on future damages.

enacted the new statute regulating the awarding of pre-judgment.[sic] *See Woodward v. Ortiz,* 150 Tex. 75, 237 S.W.2d 286 (1951). If the legislators were aware of *Cavnar,* they could have hardly used language which more clearly expressed a desire to allow a party to recover pre-judgment interest on the entire amount of the damages he is awarded in the judgment.

Consequently, the Legislature's failure to act in this instance is some indication of their acceptance of *Cavnar 's* premise.

A recent case has looked at the relationship of *Cavnar* and *Vail.*[4] In *St. Paul Surplus Lines Ins. Co., Inc. v. Dal–Worth Tank Co., Inc.,* 917 S.W.2d 29, 64 (Tex.App.— Amarillo 1995, no writ), the court held: "The application of the *Cavnar* holding requires that prejudgment interest be calculated on the amount of actual damages, not on the punitive damages authorized by the Insurance Code. *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d at 137; *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d at 555." On rehearing, the court amplified it holding by stating:

> The trial court computed prejudgment interest under the holding of *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), and trebled the amount as an element of Dal–Worth's actual damages. St. Paul used its fifty-third point of error to contend the trial court erred in awarding prejudgment interest under the holding of *Cavnar,* and in trebling the prejudgment interest. In disposing of St. Paul's contentions, we held that *Cavnar* required prejudgment interest to be calculated on the amount of actual damages, not on the punitive damages authorized by the Insurance Code, and with that explanation, we overruled the point of error.
>
> St. Paul asserts that it interprets our opinion as agreeing that prejudgment interest may not be trebled because to do so erroneously permits interest on punitive damages; but, if not, we should so hold. Noticing that we did not state that the trial court erred by trebling prejudgment interest, sustain St. Paul's point of error, or reverse, in part, on the interest issue, Dal-

Worth and Mission Butane respond by stating that we should clearly hold that prejudgment interest is an element of actual damages subject to trebling under the Code and affirm the portion of the judgment trebling prejudgment interest.

By approving the trial court's calculation of prejudgment interest on actual, but not punitive, damages under the *Cavnar* holding and overruling the point of error, we necessarily overruled St. Paul's contention that the trial court erred in trebling the prejudgment interest. *See, e.g., Celtic Life Ins. Co. v. Coats,* 831 S.W.2d 592, 598–99 (Tex.App.—Austin 1992), *modified on another ground,* 885 S.W.2d 96 (Tex.1994). Consequently, we did not disturb the trial court's methodology.

I find no fault in the Amarillo court's reasoning. The trial court correctly applied the prejudgment interest prior to "capping". I would affirm the trial court on this issue.

---

**4.** Albeit in the treble damages context.